Burton *v.* Pyramid Life Insurance Company.

4-5546                                                     130 S. W. 2d 706

Opinion delivered July 3, 1939.

*Wilson & Wilson*, for appellant.

*Verne McMillen* and *H. B. Stubblefield*, for appellee.

GRIFFIN SMITH, C. J.   November 15, 1926, Pyramid Life Insurance Company issued policies numbered 960 and 961 on the life of Finis E. Burton, agreeing to pay appellant the principal sums in the event of the insured's death.

Premiums on each policy, if paid annually in advance, were $112.78; if paid semi-annually in advance, $58.65; if paid quarterly in advance, $29.88. There were provisions for cash surrender or loan values.

Annual premiums were paid to November 15, 1931, but the premiums then due were not paid by the insured, nor did he thereafter make any payments. He died June 18, 1937.

The cash surrender or loan values [1] were from time to time applied in payment of premiums under authority of automatic loan provisions of the contracts. Each policy was issued in the principal sum of $2,500; and because each (in all respects material to this opinion) is similar, discussions are confined to a single policy.

After hearing all of the testimony, the trial court concluded that questions of law only were presented, and judgment was given for the defendant.

---

[1] At end of first and second years, nothing. At end of third year, $130; fourth year, $200; fifth year, $270; sixth year, $345; seventh year, $420; eighth year, $497.50; ninth year, $577.50; tenth year, $660; eleventh year, $745.

It is urged by appellant that the testimony of her accountant-witness was in conflict with that of appellee's assistant secretary and treasurer, who was also an expert accountant; that the conflicts went to substantial questions of values and to the accuracy of computations, and that only through witnesses skilled in respect of such matters can the alleged fallacious methods of accountancy employed by appellee be shown.

We agree with the court below that conclusions to be drawn from the evidence involve questions of law. All factual bases having been admitted, the result must be determined from a construction of the policies, essentials of which are copied in the margin.[2]

---

[2] If any premium shall not be paid on or before the due date (a grace period of 31 days without interest being allowed), liability of the company shall be "as herein provided." The insured had the privilege, during his lifetime, of receiving all cash values, loans, and other benefits that might accrue. The reserve was to be computed according to the American Experience Table of Mortality, with interest at $3\frac{1}{2}\%$ per annum, ". . . on the basis of a one-year term insurance for the first year, and thereafter on the plan [provided in the policy] at an advance of one year in the entry age of the insured At any time after three full years' premiums have been paid, and while the policy is in full force, the company will loan, upon proper assignment of the policy, and upon the sole security thereof, an amount which, with interest thereon to the end of the current policy year, shall not exceed the cash surrender value, at the end of the said year, deducting therefrom any unpaid portion of the premium for said current policy year, any existing indebtedness on the policy, and interest on the loan to the end of the current policy year. Interest on the loan will be at a rate not exceeding six per cent. per annum, payable annually in advance. . . . After three full annual premiums have been paid on the policy any premium thereon, or other indebtedness, which shall not be paid when due, or within the period of grace, shall be charged as an automatic policy loan, with interest at six per cent. per annum, payable annually in advance, as long as the then loan value, in accordance with the table of guarantees [herein] set forth are sufficient to cover such loan and all other indebtedness to the company. If at any time the loan value, less all indebtedness to the company, be not sufficient to pay the entire premium then due, such value shall be used to pay the premium for a proportionate period. No grace will be allowed under this provision. At any time while this policy is thus continued in force, payment of premium may be resumed without any evidence of insurability being required by the company."

Attention is first directed to the provision that ". . . After three full annual premiums shall have been paid on the policy, any premium thereon, or other indebtedness, which shall not be paid when due, or within the period of grace, shall be charged as an automatic policy loan, with interest at six per cent. per annum, payable annually in advance, as long as the then loan values, in accordance with the table of guarantees hereinafter set forth, are sufficient to cover such loan and all other indebtedness to the company."

The fifth policy anniversary was attained November 15, 1931. No premium was then paid by the insured, nor was it paid within the grace period of 31 days. The company invoked the automatic loan provision by charging a premium against the accumulated values. No independent funds having been remitted by the insured to pay interest in advance on the loan, an additional charge of $7.22 was extended to cover this service. Annually thereafter similar loans were made until November 15, 1935. At that time the company's records showed an insufficient balance in the loan account to pay a full year's premium. Accordingly, a letter was directed to Finis E. Burton informing him of the claimed status of the policy;[3] that the full cash value was $577.50, against

---

[3] May 11, 1936, the company wrote the insured: "As you know, your Pyramid Charter Policies provide for your insurance to be kept in force so long as there is any cash value left in the policies. Since you did not pay the premium due Nov. 15, 1935, on policy No. 960 and 961, we made automatic loans on each of the policies at the time, paying your premiums up to May 15, 1936. The full cash value of each policy amounts to $577.50. Against this we have an automatic loan of $527.87. The semi-annual premium due November 15, 1935, [was] $58.65, less dividend accumulation of $56.28 [the difference being $2.37]. Interest to November 15, 1936 [was] $33.83 [or a total indebtedness of $564.07], leaving available on each policy at this time $13.43.

"Feeling that you would prefer to carry these as regular loans rather than automatic loans [we are] enclosing a policy loan agreement on each of your policies in the amount of $564.07, and ask that you please sign these . . . and return to us at once, together with the policies for endorsement of the loans. We will then make the necessary entries to our records and forward you receipts for the semi-annual premiums, paying your policies until May 15, 1936.

which automatic loans aggregating $527.87 had been made; that dividends had accumulated to the amount of $56.28; that a semi-annual premium of $58.65 had been paid by an equal loan; that interest to November 15, 1936, amounted to $33.83, and that the credit difference in his favor was $13.43.[4]

There was no reply to the company's letter of May 11, 1936, but April 21, 1937, Burton's attorney wrote, mentioning the two policies, and stating: "I will appreciate your writing me the status of [these contracts]; that is, as to loan values and extended insurance, or term insurance. . . . In other words, please give me detailed information as to the exact status." Reply to this letter is shown in the footnote.[5] A second letter (April 26, 1937) was written by the company, explaining certain dividends, but they are not to be considered here.

Evidence on behalf of appellee (consisting of records and personal testimony), and matters under attack of appellant, show that the controversy revolves around methods of bookkeeping and accountancy employed by

"Therefore, I am enclosing notices of payments due May 15, 1936, on each of the policies, and if these quarterly premiums of $29.88 each are paid before June 15th, your insurance will be paid until August 15, 1936. If these are not paid before that time, it will be necessary for us to apply the $13.43 to pay your premiums as far as that will carry it, then your protection will lapse. We should regret very much to see you lose this protection, for it is protection which cannot be replaced at anything like the same price. For this reason [we] hope you will sign the loan agreements and return to us, and also be able to take care of the premiums, so that your policies will not lapse."

[4] The letter of May 11, 1936 fixed the balance of $13.43.

[5] April 22, 1937, the company wrote the insured's attorney: "We have your letter of April 21 in regard to [the policies]. Mr. Burton paid the premiums on these policies through the annual premium which was due Nov. 15, 1930, and this was the last payment which he made on these policies. Under the terms of the policies the premiums were to be carried by automatic loans so long as there was any value left in these policies. The automatic loan feature carried these policies until July 15, 1936, and the policies lapsed as of that date. We shall be glad to consider the reinstatement of these policies at any time Mr. Burton furnishes evidence of insurability and paying the necessary premiums."

appellee subsequent to November 15, 1931, when the first policy loan was extended.

Accrual of dividends (as distinguished from cash or loan values) constituted a policy credit of $56.28. Since the difference between the cash or loan value (hereafter referred to as the loan value), when supplemented by the dividends, was not sufficient to pay a full year's premium, such dividends were deducted from a semi-annual premium, the difference being $2.37;—that is, the accu. mulated dividends were $2.37 less than the semi-annual premium of $58.65, which was at that time loaned.

The $2.37 differential was added to the debt of $527.87 existing as of November 15, 1935, making a total of $530.24. A year's interest on $530.24 at 6% was charged, and a credit extended to November 15, 1936. This interest, according to the company's method of calculating, was $33.83, making a total indebtedness of $564.07. While the semi-annual premium only carried the policy to May 15, 1936, interest on the loan was charged "annually in advance," and such interest, therefore, was paid to November 15, 1936. The loan value as of November 15, 1935, being $577.50, difference between it and the indebtedness was $13.43.

These results, as arrived at by the company, are based upon a system of computation which assumes the right, in lending the insured an annual, a semi-annual, or a quarterly premium, to also advance an amount sufficient to pay interest on the loan.

For example, $112.78 at six per cent. for one year would call for interest of $6.77. If the insured had paid such amount from his own funds, $6.77 would have been the payment required to carry $112.78 a year. By the method applied in the instant case the company charged interest on the item of $6.77, amounting to 41 cents, and it also charged interest on 41 cents, amounting to 2 cents. The total amount chargeable under this plan would be $7.20. However, the company made this item $7.22.

An illustration of the method of calculation, found in appellant's brief, assumes a loan of $100 at six per

cent, on which interest for a year is $6. Interest on $6 is 36 cents, and interest on 36 cents is 2 cents. It is assumed (and this is true) that the company loaned not only the full amount of the premium (in the hypothetical case $100), but that it also advanced $6 to pay the interest on the interest on the interest. Hence, it is stated, 6.00 plus .36 plus .02 gives 6.38.

Applying this system to the case at bar, the company, in arriving at the sum chargeable to the borrower, multiplied $112.78 by 6.38. The result would seem to be $7.1953, and not $7.22, as the entries show.

May 15, 1936, an additional premium fell due; and, under the company's rules, the balance of $13.43 being insufficient to pay a quarterly premium (shortest period allowed under the contract), the residue was applied as a fractional premium to keep the policy alive one month and eight days. But, in reality, the extension was for two full months—to July 15, 1936.

For the purpose of determining what balance would have remained in the loan values had interest on the loans been computed without allowing for interest on interest on interest, the tabulation shown in the footnote [6] has been prepared. The result shows the "carry over," or unused loan value balance, would have been $20.64 instead of $13.43. This fund, if applied in the manner use was made of the item of $13.43, was sufficient to have extended the policy slightly more than two months beyond May 15, 1936; and, inasmuch as the company arbitrarily credited premiums to July 15, 1936, the difference of $7.21 is not material, and we do not determine here whether the company had a right to charge interest as

---

[6] Computing interest on the various loans at 6 per cent., without allowing "interest on interest on interest," we have the following results: November 15, 1931; Premium, $112.78; interest, $6.77. November 15, 1932: Premium, $112.78; interest on $232.33, $13.94. November 15, 1933: Premium, $112.78; interest on $359.05, $21.54. November 15, 1934: Premium, $112.78; interest on $493.37, $29.60. November 15, 1935: Difference between semi-annual premium of $58.65 and accumulated dividends of $56.28, $2.37—$525.34. November 15, 1935: Interest on $525.34 for one year (to November 15, 1936), $31.52; total, $556.86. November 15, 1935: Loan values at end of ninth year, $577.50. Balance, $20.64.

it did. The question is moot, in view of the showing to be made *infra* that even if $7.21 had been added to certain apportionable loan values, the combined fund was not sufficient to keep the policy alive.

While the loan value at the end of the ninth year was $577.50, and while the company declared the policy lapsed as of July 15, 1936, it is contended by appellant that at the expiration of six months from November 15, 1935, one-half of the tenth-year loan value became available, and that a new credit of $41.25[7] was in the company's hands because the contract permitted payment of semi-annual premiums. *Security Life Insurance Company* v. *Matthews*, 178 Ark. 775, 12 S. W. 2d 865; *Smith* v. *John Hancock Mutual Life Insurance Company*, 195 Ark. 699, 114 S. W. 2d 15.

We think the cited cases sustained appellant's views, and require apportionment, unless there is something in the contract expressly or by necessary implication preventing it. The policy provides for automatic loans. ". . . as long as the then loan value, in accordance with the table of guarantees hereinafter set forth are sufficient to cover such loan and all other indebtedness to the company."

The words, "in accordance with the table of guarantees" would refer to nothing but the annual values, and a strict construction would not permit apportionment. However, the Matthews Case is authority for the rule that when loan values are shown by the printed tables to be available only at the end of designated policy anniversaries, yet if the contract authorizes semi-annual or quarterly payment of premiums the loan values must be regarded as divisible, and are to be prorated accordingly. There are no provisions in the policies before us which would bring them within an exception to the rule in the Matthews Case.

We hold, therefore, that one-half of the loan value in question—that is, one-half of the difference between the ninth and the tenth year values, or $41.25—must be

---

[7] The item of $41.25 is arrived at by taking one-half of the difference between the ninth-year loan value and the tenth-year loan value.

credited to the insured's account as of May 15, 1936, and such sum should have been used at that time to supplement the residue.[8]

For the purpose of this opinion we use the larger figure—$20.64—instead of $13.43, and find that the credit balance is $20.64 plus $41.25, or $61.89.[9]

To keep the policy alive by applying loan accretions, it was necessary to pay at least a quarterly premium from accumulated values. The balance remaining when the premium is paid ($29.88 from $61.89) is $32.01. Interest at six per cent. is payable. For six months this would be 90 cents.[10] Payment of the quarterly premium is mentioned for the purpose of analysis—to show that if the company's methods of computing interest had been proper, and that if the residue as of May 15, 1936, had been correct ($13.43), the item of $41.25, when added to such residue, would have resulted in a credit of only $54.68—an amount insufficient by $3.97 to pay a semi-annual premium.

Having (for the purpose of comparison only) adopted $20.64 as the balance tentatively to be used in supplementing the apportionable loan value of $41.25, we proceed with the total of these items—$61.89—to determine whether by any permissible method of computation the policy could have been kept alive until June 18, 1937.

If payment of a semi-annual premium had been made from the automatic loan fund May 15, 1936, interest on such amount ($58.65) to November 15, 1936, would have been $1.76, to which date all other interest had been paid, and the unused portion of $61.89 would have been $1.48.

At this point interest on loans is payable annually in advance; and, to maintain the policy, not less than

[8] Under the company's method of computing interest, the item of $20.64 shown as a balance in note No. 6 would have been $13.43.

[9] If the company's "residue" of $13.43 should be used, the credit would be $54.68.

[10] The contract requires payment of interest "annually in advance," but for the purpose of computing interest on this item to the maturity of other loans, the interest has been arbitrarily calculated and charged for six months only.

a quarterly premium must be paid if the loan values are to be apportioned. If the residue is not sufficient to pay a quarterly premium, it must be applied to carry the policy for the correct number of days.

By recapitulation it is found that the old balance—indebtedness—as of November 15, 1936, was $617.27. To this must be added the quarterly premium, or a total of $647.15. One year's interest in advance is $38.83, a grand total debt of $685.98. Total credits are $681.25, or a difference of $4.73 in the company's favor, constituting a charge against the policy which cannot be offset by any available credit. The item of $681.25 includes $21.25,[11] this being one-fourth of the difference between the tenth and the eleventh year loan values.

If this analysis is correct, there is only one item not accounted for, of which no mention is made in the proof, nor is there any reference to it in the briefs. Dividends aggregating $56.28 were credited in November, 1935. These annual dividends varied from $12.15 in 1932 to $14.65 in 1935. But even if they had amounted to $15 from 1935 to 1936 and had been payable under terms of the policy (which was not the case),[12] still there was not a sufficient balance for payment of a quarterly premium,[13] without which the policy could not be kept alive.

Having, in order to determine whether by any favorable method of calculation and contractural construction, appellant would be entitled to recover, and having concluded that when all permissive values have been applied they were insufficient to have maintained the policies to June 18, 1937, it follows that the judgment must be affirmed. It is so ordered.

---

[11] An amount which would not be available for credit until February 15, 1937.

[12] Dividends are based upon the company's annual net profits, and cannot be determined until the *end* of the year, and are therefore not apportionable.

[13] Loan value Nov. 15, 1936, ($660) plus hypothetical dividend, of $15 make total estimated credits of $675. Total charges, including quarterly premium of $29.88 due Nov. 15, 1936, plus interest of $38.80 for one year in advance, make $685.98—a deficit of $10.98.